Parsons, C. J.
Upon the exception to the replication in this case we shall give no opinion, as the sufficiency of the plea to abate the writ seems to be the principal question.
Our statutes recognize alienage and its effects, but have not defined it. We must, therefore, look to the common law for its definition. By this law, to make a man an alien, he must be born without the allegiance of the commonwealth ; although persons may be naturalized or expatriated by statute, or have the privileges of subjects conferred or secured by a national compact.
But it is said that, by this common law definition, the demandant is an alien, because born before the declaration of independence.
To this it is answered that, then, all the inhabitants born within the territory of the late province of Massachusetts Bay, and who were born before the declaration of independence, are also aliens.
It is, therefore, necessary to look back and consider the situation and rights of the people of Massachusetts, when they renounced all allegiance to the king of Great Britain.
The dispute between the colonies and the mother country was founded on the claim made by the British Parliament * to legislate for the colonies in all cases whatever. In that Parliament the colonies were not, and it was morally impossible that they should be, effectually represented; and a submission to this claim would have degraded them to the rank of subjects to their fellow-subjects in Great Britain; at whose will, with the concurrence of the king, they must have holden and enjoyed their dearest rights and privileges. Our ancestors considered it as a right essential to the character of freemen, to be bound by no laws but those to which they, either personally or by their representatives, had assented. This right was recognized as a fundamental principle of the English constitution, and was not forfeited. or abandoned by them, when they, with the assent of the king, removed to this country. It was acknowledged that they and their posterity owed, and were to owe, allegiance to him and his successors, as their sovereign, which was the bond of connection between them and their fellow-subjects who remained in England
*403 Although, in the early stages of the contest, the colonies were willing that Parliament should exercise the right of external taxation, for the regulation of the general commerce of all the subjects of the king, yet that Parliament should lay internal taxes, or have a right to bind the colonies in all cases, were propositions resisted with great unanimity and zeal. This dispute was continued until the revolutionary war commenced; and it was terminated by the colonies renouncing their allegiance to the king.
Until that renunciation, the people of the province of Massachusetts Bay considered themselves as constituting a political corporation, which possessed exclusively the powers of legislation, which acknowledged the king of Great Britain as sovereign, possessing all the rights, privileges, and prerogatives, of sovereignty ; among which was the right of claiming the allegiance of all persons born within the province, as born within the territory of which he was sovereign.
This people, in union with the people of the other colonies, considered the several aggressions of their sovereign * on their essential rights as amounting to an abdication of his sovereignty. The throne was then vacant; but the people, in their political character, did not look after another family to reign : nor did they establish a new dynasty ; but assumed to themselves, as a nation, the sovereign power, with all its rights, privileges, and prerogatives. Thus the government became a republic, possessing all the rights vested in the former sovereign ; among which was the right to the allegiance of all persons born within the territory of the province of Massachusetts Bay.
That the people of Massachusetts proceeded on these principles, is evident from several considerations. After the commencement of the war, when there was no governor or lieutenant-governor in the province, the chair was deemed to be vacant; and the major part of the council, agreeably to the provisions of the solemn compact made by charter between the king and his people, assumed the executive power.
After the declaration of independence, no act was passed, confirming or establishing the previous laws, or the rights or interests existing under or derived from them ; but they were considered as remaining in force, and as having the same effect, so fai as they were not necessarily altered or modified by the substitution of the sovereignty of the people. Indeed, the people were too wise, at that day, to consider the abdication of their former sovereign as a dissolution of the social compact, as the annulling of all their laws, as an extinction of their rights, and as reducing them to a state of nature, without government, or laws, or political rights, until a new social compact could be established.
*404 It was on this principle that the legislature, in the year 1779, by two several acts, the conspirators’ act, and the absentee act, as they were generally called, enacted that certain persons, and certain descriptions of persons, were offenders in withdrawing themselves from the country, and joining or assisting the British armies before'the declaration * of independence ; and as offenders against the people, inflicted upon them the punishment of expatriation and forfeiture for that offence. The declaring that those persons, most of whom were born within the territories of the province of Massachusetts Bay, should be deemed aliens, would be very absurd, unless they were recognized, before and until the passing of those acts, as subjects.
It was, therefore, then considered as the law of the lana, that all persons born within the territories of the government and people, although before the declaration of independence, were born within the allegiance of the same government and people, as the successor of the former sovereign, who had abdicated his throne. And as his successor, the same government and people have succeeded to all the crown lands within the territory, as lawfully appertaining to them. And as the inhabitants of England, born in the reign of the second James, were considered as born within the allegiance of his successor, William the Third, — because born in the territory of which he was the sovereign, he having succeeded by parliamentary designation, — so all persons, born within the territories of the province of Massachusetts Bay during the reign of the late king, are considered as born within the allegiance of the commonwealth of Mcssachusetts, as his lawful successor.
Although, soon after the declaration of independence, the people assumed, as the name and style of their political corporation, the appellation of “ the government and people of the Massachusetts Bay in New England, yet, when a new form of administering the government was adopted, the name of “ the commonwealth of Massachusetts” was assumed, not as successor to the government and people, but as a new and more appropriate appellation of the same political corporation under a new form of administration. And the provision for continuing the former laws and magistrates was adopted from great caution, and not as introducing, in fact, any new provision, without which we should have had neither laws nor officers.
* From the preceding observations, it is very clear that the common law, which was in force, had superseded the necessity of defining by statute alienage or allegiance. And from the definitions of alienage and allegiance, the nature and effect of *405 naturalization and of expatriation are manifest. We now have legal principles, to direct us in pleading alienage.
The plea of alien friend must allege that the supposed alien was born without the allegiance of the commonwealth. To this rule persons expatriated by force of the conspirators’ and absentee acts are exceptions; — this alienage must be pleaded specially. To the general plea of alien friend, naturalization may be replied, which places the alien upon the same ground as if born a citizen.
The political relations of the commonwealth furnish other replications ; — that, although born within the allegiance of the king of England, and without the allegiance, of the commonwealth, they were inhabitants of this state at the ratification of the treaty of peace between the United States and Great Britain ; — or that they are citizens of Some other of the United States, and so, by the federal constitution, entitled to the privileges of citizens within this state. Or British subjects may confess and avoid the plea of alienage by bringing themselves within the provisions of the treaty of amity, commerce, and navigation, made in the year 1794, between the United States and Great Britain.
This claim of the commonwealth to the allegiance of all persons born within its territories, may subject some persons, who, adhering to their former sovereign, and residing within his dominions, are recognized by him as his subjects, to great inconveniences ; especially in time of war, when two opposing sovereigns may claim their allegiance. But this inconvenience cannot alter the law of the land. If they return to the country of their birth, they will be protected as subjects. And their situation is not different in law, whatever may be their equitable claims, from the situations of those citizens of the commonwealth, who may * be naturalized in the dominions of a foreign prince. The duties of these persons, arising from their allegiance to the'country of their birth, remain unchanged and unimpaired by their foreign naturalization. For by the common law no subject can expatriate himself.
Protection and allegiance are reciprocal. The sovereign cannot refuse his protection to any subject, nor discharge him from his allegiance against his consent; and he will remain a subject, unless disfranchised as a punishment for some crime. So, on the other hand, he can never discharge himself from his allegiance to his sovereign, unless the protection which is due to him from the laws is unjustly denied him.
We will now consider the record before us. The plea is very properly a plea in abatement. It alleges the demandant to have been born within the allegiance of the king of Great Britain; but *406 it admits him to have been born in Boston, within the territories of which the commonwealth of Massachusetts is now the sovereign. The plea thus far may be pleaded in abatement to every inhabitant of the state, who was living before the 4th of July, 1776. It, therefore, could not avail the tenant. But the plea goes farther, and alleges that the demandant, before July, 1776, removed into the province of Canada, then and now within the dominions of the king of Great Britain, and has never returned.
But we are of opinion that his allegiance to that king was founded on his birth within his dominion of the province of Massachusetts Bay; and that upon his abdication, that allegiance accrued to the commonwealth, as his lawful successor. The demandant must, therefore, in our courts of law, be deemed a subject, and not an alien; it not being alleged that he has been expatriated by virtue of any statute or any judgment at law.
The plea is, therefore, bad ; but the interlocutory judgment must be entered, according to the issue in law that is joined, that the replication is good, and that the tenant * answer over. For a replication which might be an insufficient answer to a good plea, may be a sufficient answer to a bad plea.
It may be remarked that the form and effect of the plea of alien friend, which is pleadable only in real actions, has alone been subject to our deliberation. The case of an alien enemy requires a distinct consideration; but it is not now before us. (a)

Bespondeas ouster awarded.

 [See Sewall vs. Lee, ante, p. 363.—Ed.]